Leavitt v. Bell.

ISAAC S. LEAVITT V. ELLEN E. J. BELL ET AL., APPELLANTS, AND GEORGE D. COOK, APPELLEE.

FILED MAY 4, 1898. No. 7960.

1. **Incompetent Persons:** PARTIES TO ACTIONS. The fact that one is an infant, idiot, or insane person does not prevent his being sued either at law or in equity.

2. ———: ———: TAX-SALE CERTIFICATE: FORECLOSURE. Section 119, chapter 77, article 1, Compiled Statutes 1897, does not forbid the owner of a real-estate tax-sale certificate from maintaining an action to foreclose the same, although the owner of the real estate may be an infant, idiot, or insane person.

3. **Tax-Sale Certificate:** FORECLOSURE: PARTIES. The equitable owner and holder of a real-estate tax-sale certificate may maintain an action in his own name to foreclose the same, although it has never been formally indorsed by the original purchaser at the tax sale in accordance with the provisions of section 117, chapter 77, article 1, Compiled Statutes 1897.

4. **Quitclaim Deeds.** In the absence of a contrary intent inferable therefrom, a quitclaim deed for real estate passes all the interest the grantor has in such real estate at the date of the delivery of such deed.

5. ———: TAX-SALE CERTIFICATE. Such a deed is sufficient to vest in the grantee the equitable title to a tax-sale certificate of the real estate owned by the grantor.

6. **Special Assessments:** IMPROVEMENT OF STREETS. Section 69, chapter 12a, Compiled Statutes 1887, construed, and *held* that the presenting to a metropolitan city council of such a petition as the one required by said section is a jurisdictional prerequisite to authorize it to charge by ordinance the cost of paving streets to the property abutting thereon,

Leavitt v. Bell.

7. ———: ———.  Certain special paving taxes, levied on the property in controversy by ordinance passed by the mayor and council of the city of Omaha, *held* void, because the paving of the streets was not petitioned for in accordance with the provisions of said section 69.

8. **Tax Lien:** ENFORCEMENT: BURDEN OF PROOF.  Where a lien is sought to be enforced for general taxes, the presumption is that the statutes in reference to the levy and assessment of the taxes and to the sale of the real estate for their non-payment has been complied with; and the burden of showing irregularities, or that the tax sale is void, is upon the party asserting such fact.

9. ———: ———: ———.  But no such presumption can be indulged when a lien is sought to be enforced against real estate for a sale made thereof for the non-payment of special taxes.  In such a case he who asserts the lien and seeks to enforce it has the burden of showing the validity of the tax lien.  *Smith v. City of Omaha*, 49 Neb. 883, followed.

10. **Special Taxes:** LEVY: JURISDICTION.  A metropolitan city council has no jurisdiction to pass an ordinance levying special taxes against real estate until, sitting as a board of equalization, it has first determined the amount of such special taxes to be assessed against such real estate as benefits.

11. ———: ———: ———: BOARD OF EQUALIZATION: NOTICE.  And such a board of equalization has no jurisdiction to determine and fix the benefits to be levied as special taxes against real estate, until it has given notice of its sitting as such board of equalization, "for at least six days prior thereto," by publication in the official paper of the city.  (Compiled Statutes 1887, ch. 12a, secs. 73, 85.)

12. ———: ———: ———: ———: ———.  Where such a board of equalization convenes on the 28th of the month, in pursuance of a notice published on the 23d of the month, it is without jurisdiction to act, and its proceedings are void.

13. ———: ———: ———: ———: ———.  The phrase, "for at least six days prior," found in said section 85 is not complied with by publishing a notice once in the official paper of the city six days before the council convenes as a board of equalization.

14. **Mortgages:** FORECLOSURE: TAX LIENS.  A mortgagee of real estate foreclosing his mortgage is entitled to have the amount of all valid tax liens owned by him, and taxes paid to protect the same, included in the mortgage foreclosure decree.

APPEAL from the district court of Douglas county Heard below before KEYSOR, J.  *Reversed.*

*Howard B. Smith,* for appellants.

*William D. Beckett, contra.*

RAGAN, C.

Isaac S. Leavitt brought this suit against Ellen E. J. Bell, Josephine and Cyril J. Bell, the heirs at law of Joseph Bell, deceased, in the district court of Douglas county to foreclose certain tax liens upon lots 3, 4, 6, 8, 10, 13, and 14, in Jacob's Addition to the city of Omaha, of which said Joseph Bell died seized. George D. Cook was made a party defendant to the action, and before the return day of the summons issued for him at the commencement of the action he filed an answer, in the nature of a cross-petition, setting out that he had a mortgage upon the real estate, made by Joseph Bell, deceased, and asking to have it foreclosed. Howard B. Smith, an attorney at law, was by the court appointed guardian *ad litem* for Josephine and Cyril J. Bell, minors. While the action was pending Leavitt by quitclaim deed transferred his interest in the real estate in controversy by virtue of his tax-sale certificates to one Byron R. Hastings, and he subsequently transferred his interest in the real estate by virtue of the certificates of tax sales by a quitclaim deed to Cook, who thereupon filed a supplemental petition, alleging, in effect, that he had purchased these tax-sale certificates formerly held by Leavitt and all his liens on the real estate in controversy by virtue of such tax-sale certificates, including the taxes which he had subsequently paid to protect his liens; and that he had done this in order to protect the lien of his mortgage upon said real estate. The answer of the widow and her minor children by their guardian *ad litem* put in issue the validity and legality of the tax levies and assessments upon which the tax certificates were based and the levy and assessment of the taxes subsequently paid to protect the liens of those certificates. The court entered a decree giving Cook two liens upon the premises—a first lien for the taxes for which the property had been originally sold and the taxes subsequently paid to protect such sale, and provided in the decree that the minor children of

Joseph Bell might redeem the real estate from this tax lien at any time within two years after they became of age. The second lien awarded Cook was for the amount due him upon his mortgage. From this decree both parties have appealed.

1. The appeal of the Bells: The first argument is that since the constitution (section 3, article 9) gives to the owners of real estate the right to redeem the same from all sales made thereof for the non-payment of taxes or special assessments at any time within two years after such sales, and since section 119, chapter 77, Compiled Statutes 1887, being section 119, chapter 77, article 1, Compiled Statutes 1897, provides that infants, idiots, and insane persons may redeem any real estate belonging to them which has been sold for taxes at any time within two years after their disability has been removed, therefore this action cannot be maintained to foreclose these tax liens against that part of the real estate owned by the minor children until they become of age. We have not been cited to any authority in support of this contention, nor have we been able to find one. Taxes upon real estate are by the statute made a perpetual lien thereon, and when the real estate has been sold for nonpayment of the taxes the purchaser is by the statute given the right to bring a suit to foreclose his tax lien and have the real estate sold for the purpose of repaying him the amount paid at the sale with interest and subsequent taxes paid to protect his lien. It may be—we do not decide—that where the real estate of an infant, idiot, or insane person, during his disability, is sold under a decree to satisfy a lien thereon for taxes, such a person, within two years after the removal of his disability, may redeem the real estate; but we do not understand that the fact one is an infant, idiot, or insane person prevents his being sued either at law or in equity.

2. A second argument is that Hastings did not acquire the title and the right to foreclose the certificates of tax sales owned by Leavitt by virtue of the quitclaim deed

from the latter and that Cook did not acquire the title and the right to foreclose the Leavitt certificates of tax sales by the quitclaim deed from Hastings. This argument is based on counsel's construction of section 117, chapter 77, article 1, Compiled Statutes 1897, which provides that a tax-sale certificate shall be assignable by indorsement, and that an assignment thereof shall vest in the assignee, or his legal representative, all the right and title of the original purchaser. The contention of counsel is that the only method by which Cook could acquire a title to the Leavitt certificates of tax sales was by an indorsement thereof in writing by Leavitt. It may be, and probably is, true that, in order for the holder of a certificate of tax sale to vest the legal title of the same in his vendee, it should be indorsed in the same manner as a promissory note payable to order. But we do not understand the meaning of the statute to be that, unless a certificate of tax sale is thus indorsed, one who purchases and pays for such a certificate fails to acquire any title thereto or the right to enforce it. One who has purchased and paid for and has in his possession a negotiable promissory note payable to order of his vendor has such an equitable title to the same that he may maintain a suit at law or in equity to enforce its collection. (*Greeley State Bank v. Line*, 50 Neb. 434; *Hartzell v. McClurg*, 54 Neb. 316.) Leavitt did not transfer his certificates of tax sales to Hastings by indorsing them; but for a valuable consideration he sold and delivered them to him, and then duly executed to him a quitclaim deed in and by which he remised, released, and forever quitclaimed unto Hastings the real estate in controversy, together with all the estate, right, title, interest, claim, and demand which he, Leavitt, had therein. Hastings did not indorse the tax certificates to Cook, but for a valuable consideration sold and delivered them to him, and at the same time duly executed and delivered to him a quitclaim deed for the real estate upon which the certificates were liens, which deed contained the same recitals as the deed from Leavitt

to Hastings. It was the intention of the parties by the execution of these quitclaim deeds that the liens which Leavitt and Hastings had upon the real estate by virtue of the tax-sale certificates should be assigned and transferred to Cook. Section 50, chapter 73, Compiled Statutes, provides: "Every conveyance of real estate shall pass all the interest of the grantor therein, unless a contrary intent can be reasonably inferred from the terms used." Section 53 of the same chapter provides: "In the construction of every instrument creating or conveying, or authorizing or requiring the creation or conveyance of any real estate, or interest therein, it shall be the duty of the courts of justice to carry into effect the true intent of the parties." We think, therefore, that Cook had the equitable title to the Leavitt certificates of tax sales and as such equitable owner he might maintain this action.

3. A third argument of the Bells, which we notice, involves the validity of certain paving taxes of the city of Omaha. Part of lot 10 and lots 13 and 14 of the property in controversy were in paving district 123. The city council of the city of Omaha, for the purpose of determining the amount of the benefits in money which had or would accrue to these lots by reason of the paving of the streets in said district, met August 28, 1888, and fixed, determined, and decided that said lots would receive benefits by reason of said improvement as follows: Part of lot 10, $111.35; lot 13, $226.04; lot 14, $226.04; and subsequently the city council passed an ordinance levying the said amounts of money against said lots as special paving taxes. These taxes and interest thereon are included in the decree for taxes rendered in this case in favor of Cook. These special taxes and all of them, we think, were void for two reasons: (1.) The statute in force at that time (Compiled Statutes 1887, ch. 12a, sec. 69) authorized the mayor and council of a city of the metropolitan class to pave the streets and alleys in a paving district whenever the owners of the lands or lots abutting upon said streets or alleys and representing a majority

of the feet front thereof should petition the council so to pave. Although the streets and alleys in said paving district seem to have been paved in pursuance of authority of the mayor and council of the city of Omaha, the same was done without the petition of the owners, or any of them, of the property abutting said streets and alleys. The presenting to the city council of such a petition as the one required by said section of the statute was a jurisdictional prerequisite to authorize the council to pave said streets and charge the cost thereof to the abutting property. (*Von Steen v. City of Beatrice,* 36 Neb. 421; *State v. Birkhauser,* 37 Neb. 521; *Harmon v. City of Omaha,* 53 Neb. 164.) Not only was such a petition necessary to confer jurisdiction upon the mayor and council to authorize the paving of these streets and alleys and charge the cost thereof to the abutting property, but in this case the validity of these special taxes was, in a proper proceeding under proper pleadings, duly called in question, and the burden of showing that the special taxes had been legally levied and assessed against the property was on the party who claimed to have a lien upon the real estate growing out of such taxes. Where a lien is sought to be enforced or foreclosed for general taxes then, doubtless, the presumption is that the statutes in reference to the levy and assessment of these taxes, and the sale of the real estate for their non-payment, have been complied with, and the burden of showing irregularities, or that such a tax is void, is upon the party asserting the fact. (*Adams v. Osgood,* 42 Neb. 450.) But no such presumption can be indulged when a lien is sought to be enforced against real estate for a sale made thereof for the non-payment of special taxes or assessments. In such a case he who asserts the lien and seeks to enforce it has the burden of showing the validity of the tax lien. (*Smith v. City of Omaha,* 49 Neb. 883.) (2.) By sections 73 and 85, chapter 12a, Compiled Statutes 1887, before the city council sat as a board of equalization and fixed and determined the benefits or special taxes to be assessed against

the property in a paving district for the paving of the streets therein, it was required to give notice of such sitting as a board of equalization for at least six days prior to the sitting, through the official paper of the city. A notice was published August 23, 1888, in the official paper of the city that the city council would convene as a board of equalization, for the purpose of assessing the benefits or special taxes on the property in controversy, on the 28th of said month. Until this notice had been published as required by the statute the city council had no jurisdiction to sit as a board of equalization. The publishing of the notice on August 23, 1888, was not a compliance with the statute, which required the council to give notice of its sitting as a board of equalization "for at least six days prior thereto"—i. e., such sitting. On the determination of the benefits which had accrued or would accrue to the property in controversy by reason of the paving of the streets in said paving district, and the amount of the taxes which the board of equalization then determined should be assessed against the lots in controversy by reason of such improvement, depended the validity of the ordinance subsequently passed by the city council levying these benefits found by the board of equalization as special taxes against the property; and, since the board of equalization was itself without jurisdiction to act, the ordinance subsequently passed in pursuance of what it did was a nullity, as the city council had no jurisdiction to pass an ordinance levying these special taxes against the lots until, sitting as a board of equalization, it had determined the amount of the benefits to each lot.

4. Another argument of the Bells relates to the validity of special taxes assessed against lots 13 and 14 of the property in controversy. These lots were in sewer district No. 43. The council, as a board of equalization, on December 20, 1887, adjudged and determined that said lots had or would be benefited in money by the construction of said sewer improvements as follows: Lot 13,

$81.31; lot 14, $80.01. Subsequently the city council passed an ordinance levying said sums as special sewer taxes against said lots. The city council convened as a board of equalization December 15, 1887, for the purpose of determining what benefits had or would accrue to the lots in this sewer district by reason of that improvement. Without acting upon the matter for which it had convened it adjourned until December 17 at 7:30 P. M., and then, without acting upon sewer district 43, adjourned until December 20 at 7:30 P. M., and at that time it determined the benefits or special assessments. For the purposes of this case only we shall consider that the city council, while convened as a board of equalization, acted on December 15, 1887. A notice was published in the official paper of the city, on December 9, that the council would convene on the 15th as a board of equalization for the purpose of determining the special taxes which should be levied on the property in said sewer district 43. This notice was also published December 10, 11, 12, and 13, but it was not published on December 14. Assuming that the council acted as a board of equalization on December 15, the question then is, had it given notice by publication through the official paper of the city of its sitting as such board "for at least six days prior to the day of its sitting"? We think not. The phrase in the statute, "for at least six days prior," is not complied with by the publishing of a notice once in the official paper of the city six days before the council meets as a board of equalization. The word "for" in that phrase means "during," and the phrase must be construed as though it read that the city council shall give notice of its sitting as a board of equalization at least during the six days immediately prior to the date of its so convening. This is a strict construction of the statute. But where a law authorizes a municipal corporation to charge the entire cost of paving a public street to the property abutting thereon, it should be strictly construed; and, before the court should permit an individual's prop-

erty to be taken to pay for a public improvement of which the entire community has the benefit and use, it should be shown that the law has been literally complied with.

Section 497 of the Code of Civil Procedure provides that a judicial sale of real estate shall not be made until the officer has given public notice of the sale in a newspaper "for at least thirty days before the day of sale." Construing this section we held that the word "for" therein meant "during," and that the notice must be published during the thirty days immediately preceding the date of sale. (*Lawson v. Gibson*, 18 Neb. 137.) And it was held that one publication of the notice thirty days before the sale was not a compliance with the requirements of the Code. It was also held that it was not necessary that the notice should be published in a daily paper; that publication for the length of time required in a paper published weekly would answer the requirements of the statute. But by section 133, chapter 12a, Compiled Statutes 1887, the official newspaper of a city of the metropolitan class was required to be a daily newspaper; and since the statute required the city council to give notice of its sitting as a board of equalization, for at least six days prior to the time of such sitting, in the official newspaper of the city we think that it was the intention of the legislature that this notice should be published daily for the six days immediately preceding the convening of the city council as a board of equalization.

A statute of Illinois in reference to assessments for public improvements authorized commissioners to determine the benefits which had or would accrue to property by reason of the public improvement after "notice shall be given by said commissioners by six days' publication in the corporation newspaper." Construing this statute the supreme court of Illinois held that to invest the commissioners with jurisdiction to determine the benefits the notice must be published each day for six days immediately preceding the date on which the commissioners met. (*Scammon v. City of Chicago*, 40 Ill. 146.) To the same ef-

fect see *Whitaker v. Beach,* 12 Kan. 492; *Washington v. Bassett,* 15 R. I. 563.

Considering, then, that the board of equalization acted December 15 and the first notice of its meeting as such board was published on the 9th, then, to invest the board with jurisdiction to act, the notice must have been published also on the 10th, 11th, 12th, 13th, and 14th. Because, therefore, this notice was not published December 14, 1887, the city council had no jurisdiction to sit as a board of equalization; and the ordinance subsequently passed by it levying special sewer taxes against said lots in pursuance of the benefits found and determined by the board of equalization was void.

5. What has just been said in reference to the special taxes on the lots in sewer district No. 43 applies to the special taxes levied against lot 8 of $27.27, lot 10 $375, lot 13 $66.02, and lot 14 $66.02, for grading Leavenworth street from Sixteenth to Thirty-sixth streets, and special taxes assessed against lot 3 of $373.46, lot 4 $373.46, lot 6 $34.31, for paving in district No. 32. It consequently follows that the said special taxes above mentioned were and are void and should not have been included in the decree rendered in this case.

6. Cook's appeal: We think the district court erred in giving Cook a lien on the real estate in controversy for the amount represented by his certificates of tax sales and for subsequent taxes paid to protect such certificates as an independent tax lien. Cook, in effect, had paid these taxes for the purpose of protecting his mortgage lien upon the real estate in controversy. This he had a right to do, and the amount of these taxes, so far as they were legal, should have been included in the amount due Cook on his mortgage. (*Southard v. Dorrington,* 10 Neb. 119.) The court should not have made the taxes a separate and independent lien from the lien of the mortgage, nor should the decree have provided that the Bell heirs might redeem the real estate from the sale of these lands to pay those taxes at any time within two years after

they became of age. The decree appealed from is reversed and the cause remanded, not for a new trial, but with instructions to the district court to set aside its former decree and enter a new one in accordance with this opinion.

REVERSED AND REMANDED.

IRVINE, C., dissenting.

I cannot concur in the opinion of the court in so far as it holds that a petition by the owners of abutting property is essential to confer power on the council to order the paving of an improvement district. The cases of *Von Steen v. City of Beatrice*, 36 Neb. 421, and *State v. Birkhauser*, 37 Neb. 521, are, it is true, authority for that construction of the statute, but those cases were based entirely on an interpretation of the section of the charter involved as if it had been drawn and enacted as an entirety and at a given moment. The history of the law has been neglected, and in this instance a consideration of its history is essential to a correct construction. The germ of the section is found in section 41, chapter 8, General Statutes, being the act of March 28, 1873, incorporating cities of the first class, and framed so as to embrace Omaha alone. That section began as follows: "The council shall have power to open, extend, widen, grade, pave, or otherwise improve and keep in good repair * * * any street, avenue, or alley within the limits of the city." This was followed by provisions for special assessments to defray the expense of such improvements, but the broad grant of power conferred by the language quoted was nowhere restricted. By chapter 17 of the Laws of 1881 a new charter was provided for cities of the first class, and section 41 of the act of 1873 was carried into it, somewhat amended, but not in respect to the matters here involved, as section 42. By chapter 12 of the Laws of 1883 many amendments were incorporated into section 42. The opening sentences remained the same, but the following was inserted in the body of the section:

"The mayor and council of any city of the first class shall have power to pave, repave, or macadam any street or alley, or parts thereof, in the city, and for that purpose to create suitable paving districts, which shall be consecutively numbered, such work to be done under contract and under the superintendence of the board of public works of the city.    Whenever the owners of lots or lands abutting upon the streets or alleys within any paving district representing a majority of feet front thereon shall petition the council to pave, repave, or macadam such streets or alleys, it shall be the duty of the mayor and council to pave, repave, or macadam the same."    (Session Laws 1883, p. 101, ch. 12, sec. 1.)    By chapter 10 of the Laws of 1887 the class of metropolitan cities was created, and what was section 42 of the old charter formed the framework for section 69 of the new.    In all respects material to this inquiry the two sections were the same. In 1891 (Session Laws, p. 82, ch. 7, sec. 8) this section underwent several amendments, those chiefly affecting the question before us being the substitution of "improvement districts" for "paving districts," and the addition of a clause whereby owners of three-fifths of the frontage on a street were permitted to petition for the paving of that street, the whole expense, including that of paving intersections, to be defrayed by local assessment.

I think this section of the metropolitan charter should be construed in the light of its entire history.    While the act of 1887 created a new class of cities with a new name, it was in fact intended to be applied only to Omaha, and this had been true of the preceding acts relating to cities of the first class.    No other city had to that time been embraced within the first class of cities.    In adopting a new charter, adapted to the wants of a large and rapidly growing city, it was not intended to make an abrupt and radical change in the constitution and political history of the city.    A vast scheme of street improvements was then under way.    It had been progressing for some years, and it promised to continue indefinitely.    There can be

no doubt that the legislature intended to continue the old law substantially in force with reference to such improvements, in order that there might be no break in continuity or method.    For that reason section 42 of the old charter was preserved, with amendments going only to details. By repeated amendments that section had grown from a short paragraph until it covered pages and embraced some twenty-odd subdivisions and provisos.    That process of piece-meal amendment had not only made it inordinately long, but had made it tautological, involved, and even ungrammatical.    Unless it had been the deliberate purpose to retain it in such form that there could be no doubt of its identity with the old law, a simpler and clearer phraseology would have been adopted.    Certainly it possessed no charm of literary style which commended it for preservation.    Its preservation can only be accounted for on the theory that the legislature was so anxious to prevent a disturbance in the course of street improvement, that it would not incur the hazard of a new construction of the law by recasting its language.

If, then, the history of the law is open for consideration, I think the conclusion irresistible that it was the legislative intent to make three different provisions with regard to paving.    In the first place, the council was given plenary power to pave any street.    In the second place, the owners of the greater part of the frontage, by petition, might require the paving of any street.    The language is in that case "it shall be the duty of the" council to pave.    In the third place, on petition of the owners of three-fifths of the frontage, the street may be paved and the whole cost, including intersections, shall be defrayed by local assessment.    Paving districts and improvement districts were devices introduced by amendment for convenience in fixing limits for the purpose of assessment, and form no just ground of distinguishing between power to create districts and power to pave them.    Their creation is merely incidental to the power to pave.    It is too clear to permit of argument that the laws of 1873 and

1881 granted full power to pave without any petition. If so, when was it taken away? If by the provision of 1883, requiring the council to pave on petition, then the new language there used was sufficient to confer the limited power, or rather to impose the duty. The words granting the general power became at the best surplusage, and why were they retained? They were not only retained, but, as if to show clearly that the provision for a petition was merely supplementary to the old power, they were in substance repeated just before the petition clause, and separated therefrom by one of the few periods which occur throughout the weary length of this monstrous section. By regarding the history of the amendment and construing it as only imposing an additional duty, effect can be given to every clause, while to give it the construction placed upon it by the court, is to impute to the legislature not only the useless retention of an obsolete clause, but its actual reduplication.